

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00250-CV

_____

IN THE INTEREST OF B.B., A CHILD

_____

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CV18-0185

_____

_____

No. 02-19-00251-CV

_____

IN THE INTEREST OF A.C., A CHILD

_____

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CV14-1484

---

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

After a bench trial, the trial court terminated the parent–child relationships between Appellant J.B. (Mother)[1] and children A.C. (Amy) and B.B. (Brad).[2] In four issues, Mother challenges the factual sufficiency of the evidence supporting the trial court's best-interest findings and the legal and factual sufficiency of the evidence supporting the endangerment findings and the findings that she failed to comply with court-ordered services to obtain the children's return. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). Because we hold that the evidence is legally and factually sufficient to support the endangerment findings and that the evidence is factually sufficient to support the best-interest findings, we affirm the trial court's judgments.

## BRIEF FACTS

The Texas Department of Family and Protective Services (the Department) removed four-year-old Amy and three-year-old Brad from Mother after she hit Brad three times in the face, bruising his head and causing his eardrum to burst, and after

---

[1]The trial court also terminated the rights of the children's respective fathers, but only Mother appeals.

[2]We use aliases to refer to the subject children, their families, and their foster families. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

the doctor examining Brad's injuries saw signs of probable sexual abuse, which Brad attributed to Mother's live-in boyfriend (Boyfriend). When the children were forensically interviewed, Amy reported that Boyfriend had sexually abused her as well. Mother was indicted for injury to a child regarding Brad's injuries and jailed until January 2019. By the time of the trial, more than fifteen months after the removal, the children had been in three different foster homes. Their maternal grandmother (Grandmother), with whom the children had lived much of their lives and who had ongoing visitation with the children during the case, had intervened in the suit, asking to be named the children's sole managing conservator. The trial court heard testimony from witnesses including Grandmother and her husband (Grandfather) (collectively, Grandparents), the current foster mother (Foster Mother), the forensic interviewer, Department personnel, the children's clinical therapist, their behavioral therapist, and their guardian ad litem (GAL). Mother was called as a witness, but the criminal charges against her remained pending at trial; she invoked her Fifth Amendment privilege against self-incrimination when questioned on the stand.

The Department and Amy's father wanted termination of Mother's parental rights with no possessory rights awarded to Grandmother. Grandmother, Mother, and the children's attorney ad litem and GAL opposed termination and wanted the children to be placed with Grandmother, with Mother having supervised access to them. In its termination order, the trial court awarded Grandmother "access/visitation" with the children for one weekend every other month with the

4

condition that she provide no access to the terminated parents. Grandmother did not appeal.

## DISCUSSION

In her first and second issues, Mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed or allowed the children to remain in conditions which endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). In her third issue, she contends that the evidence is legally and factually insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specified the actions necessary for her to obtain the children's return. *See id.* § 161.001(b)(1)(O). In her fourth issue, she challenges the trial court's findings that termination of her parent–child relationships with Amy and Brad is in the children's best interests. *See id.* § 161.001(b)(2).

### I. Standard of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Texas Family Code Section 161.001(b)(1); and 2) that termination is in the children's best interests. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

5

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings—here, the endangerment and noncompliance findings—to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them or the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole

6

record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved either endangerment ground or the noncompliance ground and that the termination of the parent–child relationships would be in the children's best interests. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## II.  Invocation of the Privilege Against Self-Incrimination

Mother's repeated invocations of the Fifth Amendment privilege against self-incrimination nevertheless resulted in evidence against her. "A party may invoke his Fifth Amendment privilege against self-incrimination in a civil proceeding if he reasonably fears that the answer sought might incriminate him." *In re A.B.*, 372 S.W.3d 273, 275 (Tex. App.—Fort Worth 2012, no pet.) (citing *United States v. Balsys*, 524 U.S. 666, 671–72, 118 S. Ct. 2218, 2222 (1998)). A termination trial is a civil proceeding for these purposes. *In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *4 (Tex. App.–Fort Worth Nov. 9, 2017, pet. denied) (mem. op.); *Murray v. Tex. Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 367 (Tex. App.—Austin 2009, no pet.). In a civil case, a factfinder may draw negative inferences from a party's assertion of the privilege against self-incrimination. *See* Tex. R. Evid. 513(c); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976) (holding Fifth Amendment does not forbid

adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them); *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995); *A.H.*, 2017 WL 5180785, at *4.

### III. Endangerment

### A. Endangerment Law

As this court has often discussed,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent–child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

> . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone . . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

> Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being. . . . [E]ven if a parent makes dramatic

8

improvements before trial, evidence of improved conduct, especially of short[]duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.

*In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *2–3 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (citations and internal quotation marks omitted).

"[E]vidence of abuse of another child, coupled with a present or future danger to the child in question, is relevant to determine whether a parent has engaged in an endangering course of conduct." *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.); *see also In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). Additionally, threats to commit suicide may contribute to a finding that the parent engaged in a course of conduct that was detrimental to a child's well-being. *In re J.A.T.*, No. 04-17-00386-CV, 2017 WL 4937960, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

## B. Endangerment Evidence

The trial court heard or viewed the following evidence pertinent to the issue of endangerment:

- Mother had problems with alcohol since she was a teenager.
- Mother attempted suicide the first time when she was fifteen years old.
- Mother moved in with Amy's father and his family at the age of sixteen.

9

- Amy's father physically abused Mother, and he also used methamphetamine while they were together.

- Mother used drugs with him.

- Mother attempted suicide again at the age of eighteen.

- Mother graduated from high school in 2012.

- Amy was born in the late summer of 2013.

- Mother, Amy, and Amy's father stayed with Grandparents for about six months after Amy's birth.

- After her brief absence, Amy began living with Grandparents again in approximately May 2014. Brad began living with them as well after his February 2015 birth. Mother was diagnosed with mental illness and began taking medication soon thereafter.

- Amy and Brad stayed with Grandmother until roughly June 2015.

- Grandmother was concerned about Mother's mental health because "she would never stay on her meds."

- Mother and the children lived in "a lot" of places before November 2016, sometimes staying "a couple of nights on and off" with Grandparents and other times staying in motels at Grandmother's expense.

- In late November 2016, CPS received a referral alleging child abuse of Brad, who was twenty-one months old, by Mother. The allegation was that she was observed hitting him and yelling at him and that she was around "inappropriate people" with him in her possession.

- As part of a safety plan with the Department's Family Based Safety Services (FBSS), Mother and Grandparents agreed in November 2016 that the children would live with Grandparents primarily and that Mother would have them unsupervised for only short periods.

- Shortly thereafter during her period of possession, Mother stayed with the children in the home of relatives who she knew were known to smoke methamphetamine, though she denied knowing they were actually doing so in the home. Grandmother saw a methamphetamine

pipe when she retrieved the children from the home, and the relatives "appeared to be high."

- When a CPS investigator visited a different home, a trailer home where Mother, Brad, and three-year-old Amy were staying with relatives in December 2016, CPS discovered that the uncle who lived in the home had significant CPS history and that the trailer had holes in it. When the CPS investigator visited the trailer again in early January 2017 in freezing weather, she had to inform Mother that Brad was blue from the cold; Mother had not noticed.

- That same day in January 2017, Mother told the CPS investigator that she had been diagnosed with bipolar disorder and depression but was not taking her medication.

- The CPS investigator testified that Mother was difficult to work with and help because she was not stable and could not parent her children: "She could not control them. . . . [S]he couldn't identify their needs; you know, if they needed a change of diaper, if they, you know, were in a dangerous spot. She constantly always relied on other people to do that for her."

- Grandmother told the FBSS caseworker that Mother was not taking her mental-health medications in April 2017.

- In May 2017, Grandmother told the FBSS caseworker that Mother was a good person but just needed "a push to get on her feet" and had had unstable living situations with the children in the past.

- In June 2017, Mother could not exercise her visitation with the children because she had nowhere to take them.

- In July 2017, Mother reunited with Boyfriend after he was released from prison. Boyfriend had an extensive drug-related criminal history. FBSS "had concerns because of his history," so a safety plan was entered specifying that Boyfriend could not be alone with the children.

- The children lived primarily with Grandparents after FBSS's initial involvement until Mother leased an apartment in November 2017 and FBSS agreed that the children could live with Boyfriend and her instead. The provision that Boyfriend not be with the children unsupervised remained in place.

- In January 2018, another CPS investigator visited Mother's home after receiving a referral regarding physical abuse of Brad, who was almost three years old. The side of his face was bruised and scratched, and he had a severe diaper rash. The family, the children's daycare personnel, and the Springtown police told CPS that four-year-old Amy had hit Brad when he tried to get in her bed.

- Brad was then in the process of potty-training.

- On February 14, 2018, Mother called Grandfather to report that Brad had fallen off the bed and hurt his head. Grandfather told her to take him to the doctor; she took him to the daycare instead.

- CPS received a second referral regarding physical abuse of Brad on February 15, 2018. He had bruising extending from his temple and forehead area to behind his ear. He also had a scratch on his left shoulder. Mother and Boyfriend claimed Brad had said that he had fallen off his bed; Amy said that she had kicked him.

- CPS instructed that Grandmother take the family to the hospital.

- The police interviewed Mother and Boyfriend separately at the hospital. The Boyfriend told police that he thought Mother had caused the injuries because he had seen her hit Brad before, and sometimes she went too far. In her interview, Mother admitted in an "exasperated" tone that she had hit Brad in the face with her hand in "three rapid-succession strikes" because he had tried to bite her.

- In addition to the surface injuries, Brad's eardrum was ruptured.

- When the doctor examined Brad, she removed his diaper or pull-up. She saw a bruise on the end of his penis which she said "was most likely the result of a suction on the tip of his penis," and she also saw "some bruising in sort of a semicircle at the base of his scrotum, which" appeared to be a bitemark.

- When she saw the bruising in his private area, the doctor said, "Oh, baby, who did that?" and Brad answered, "My daddy did that."

- Brad and Amy both referred to Boyfriend as their father.

- Both Mother and Boyfriend admitted that she had been leaving the children alone with him in violation of the safety plan.

12

- Mother told the police that she had noticed the bruising on Brad's penis and that she had taken him to a doctor, but CPS checked, and she had not done so.

- The CPS investigator who observed Mother that day testified that her "reactions . . . throughout the course of that day were atypical and not what [he] would have expected from a protective parent."

- The children were forensically interviewed the next day.

- They both referred to their entire private areas as "butt."

- Brad was barely three years old, had a speech impediment, and was very distracted in the interview. He told the interviewer that Amy had slapped him, then he said that Mother had done it, and then he said that Amy had done it. He also said, "[D]addy is mean."

- Amy demonstrated in the interview that she knew the difference between the truth and a lie.

- Amy told the interviewer that Mother "would scream at her for something she didn't do" and that she did not live with Mother because she did not want Mother to scream at her. Brad's father later told CPS that Mother had yelled at the children "a lot," and Grandmother testified that Mother alarmed her when she yelled at the children because of her tone of voice and the "very loud" volume.

- Aided by an anatomical drawing, the forensic interviewer asked Brad if anyone had ever touched his penis. The response she heard was, "My daddy bull," which she did not interpret.

- The CPS investigator who observed the interview testified that in context, he interpreted what Brad had said as indicating that Boyfriend had pulled Brad's penis.

- Amy told the interviewer that Boyfriend sexually abused her "lots of times." Amy explained to the interviewer that when Mother was at work at Walmart, Amy would lie on a pillow, and Boyfriend would touch her "butt" with his tongue and "lick[] her butt like a dog." "It was cold."

- Amy also told the interviewer that she had reported the sexual abuse to Mother.

13

- Amy denied that Boyfriend had sexually abused Brad.

- Amy told her clinical therapist that Mother's "live-in man" yelled and threw things.

- Amy also told her clinical therapist about "being touched in places she did not like." Amy told her that it happened during "wrestling games" she, Brad, and Boyfriend played. Then she "shut down."

- On the next visit with the clinical therapist, in Amy's puppet play, "the paternal figure was not respecting boundaries and was not being nice, was not behaving in a loving manner." The woman was passive.

- In a play therapy session with the clinical therapist, Amy chose to make out of Play-Doh a nest, birds, and little eggs to go in the nest. She also made a snake. The "snake continued to come and get the baby eggs" while the mother bird just sat by the side. When the therapist asked if the mother bird was going to take care of the babies, Amy indicated that the mother bird should do so, but her play never reflected that. The therapist found that play concerning.

- The clinical therapist opined that the children chose to have their therapy sessions with her under a bed because it helped them feel safe.

- The children's behavioral therapist testified that the children sometimes wanted her therapy sessions with them conducted under the bed because of their "[p]ersonal emotions." They both were having nightmares about the same male figure who scared them.

Mother did not testify but invoked her Fifth Amendment privilege against self-incrimination to the questions asked of her by the various lawyers. Given the questions, the trial judge as factfinder was entitled to draw the following negative inferences from Mother's repeated assertions of the privilege, *A.H.*, 2017 WL 5180785, at *4; *A.B.*, 372 S.W.3d at 275:

- On August 7, 2017, Mother reported to MHMR that she was "having a lot of anger and mood swings" and would "yell, slam doors, throw

14

things," and hit Boyfriend, and she indicated that she needed to "find a way to stop exploding."

- Mother told MHMR that she had attempted suicide twice in the past.

- When Mother and the children lived with relatives before June 2017, Mother knew the relatives smoked K2 in front of the children.

- Mother used methamphetamine about four months before the removal.

- Mother understood the safety plan but violated it by leaving the children with Boyfriend on multiple occasions.

- Mother left the children with Boyfriend while she worked at Walmart.

- Mother slapped Brad, bruising his face and causing his eardrum to burst.

- When she testified, Mother did not live in an environment that would be safe for the children.

Grandmother testified that Mother

- had sometimes parented well but other times had not;

- had no stable home;

- would call Grandmother about how to take care of the children when they were sick or when to go to the doctor;

- would get "lost and forgetful";

- had no "follow through" regarding what she was supposed to do and when;

- got upset a lot;

- ignored the children at times; and

- did not sufficiently interact with them.

Grandmother knew that the children had suffered.

15

## C. Analysis

Mother argues that the bruises and ruptured eardrum she inflicted on Brad by slapping him are insufficient to support the termination of her parental rights, yet the cases Mother relies on—*In the Interest of B.R.P.*, No. 11-07-00255-CV, 2009 WL 1349954, at *1 (Tex. App.—Eastland 2009, no pet.) (mem. op.); *Stucki v. Stucki*, 222 S.W.3d 116, 123 (Tex. App.—Tyler 2006, no pet.); *In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *8 (Tex. App.—Austin 2005, no pet.) (mem. op.); and *MacDonald v. MacDonald*, 821 S.W.2d 458, 461 (Tex. App.—Houston [14th Dist.] 1992, no writ) (op. on reh'g)—do not involve a child as young as a three-year-old, "three rapid-succession strikes," or a ruptured eardrum. They are therefore inapposite.

Mother also argues that nothing in Boyfriend's history would have alerted her that the children were at an increased risk of sexual abuse from him, but she had already been warned that Boyfriend posed a risk to the children; she did not have to reach that conclusion on her own. FBSS had required that she sign safety plans with FBSS in which she agreed that he would not be alone with the children because FBSS had concerns about his criminal and drug history. The evidence does not show when Brad was sexually abused, but Amy told the forensic interviewer that Boyfriend sexually abused her when Mother was at work. In violating and disregarding the safety plan put in place because of unspecified risks posed by Boyfriend, Mother failed to protect the children from sexual abuse; she endangered them.

16

In sum, the evidence shows that Mother exposed the children to drug abuse, did not maintain her emotional stability by taking her prescription medications consistently and did not give the children a stable, safe home to live in. Mother physically injured Brad and had "go[ne] too far" in disciplining him before. She failed to take the actions that would have protected the children from sexual abuse and to the extent that she told the truth about having previously seen the bruising on Brad's penis, did nothing to remove them from the danger after she saw evidence of it. Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's endangerment findings. *See, e.g., In re G.H.*, No. 02-17-00193-CV, 2017 WL 4683925, at *8 (Tex. App.—Fort Worth Oct. 19, 2017, no pet. ) (mem. op.); *L.E.M.*, 2012 WL 4936607, at *14. We overrule Mother's first and second issues. Because a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination when accompanied by a best-interest finding, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we do not reach Mother's third issue challenging the sufficiency of the evidence supporting the noncompliance finding. *See* Tex. R. App. P. 47.1.

### IV. Best Interests of the Children

In her fourth issue, Mother challenges the best-interest findings.

### A. Best-Interest Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest

analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)   the [child's] desires . . . ;

(B)   the [child's] emotional and physical needs[,] . . . now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)   any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider,

among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### B. Evidence of the Children's Best Interests

### 1. The Children's Desires

The evidence was undisputed that the children and Mother were bonded. At Grandparents' house, they would grab Mother's photos to hold, and Grandfather would hear them talking about her. The children's clinical therapist testified that both children would say they missed Mother and that Amy said she wanted to live with Mother.

The children were also bonded with and loved their Grandparents. The GAL testified that the children indicated to her that they wanted to live with Grandparents. The behavioral therapist testified that the children were also bonded to Foster Mother, seemed to like her and to like being with her, and were beginning to trust her. Foster Mother was likewise attached to the children.

### 2. The Children's Present and Future Needs and Dangers

Foster Mother described the children as open, curious, receptive, very loving, and caring. Grandfather testified that Brad was bright, sweet, and rambunctious and

19

that he fell down a lot. Grandfather described Amy as very smart but said that she liked to get her little brother in trouble.

In May 2017, Amy's primary care provider indicated that she needed to see a psychologist because she had trouble sleeping, and Grandmother believed that Amy had ADHD like Mother. Brad's daycare told Grandmother before the removal that the two-year-old was not paying attention, not sitting when he was supposed to, not listening, and was playing in the bathroom.

The children's behavioral therapist, who did not meet them before the removal, testified that the children were a handful. Amy was very active, talkative, and social at first. She had some impulse-control, lying, and other social-skill issues but was eager to learn. She was verbally aggressive but exhibited no physical aggression. The behavioral therapist worked with Amy on social skills, listening in class, following directions, empathizing, and identifying her emotions.

The foster parents in the second placement liked Brad more and did not show Amy as much attention. After Amy was told that she and Brad were leaving the second placement and their potential third placement fell through, Amy began acting out, not listening, showing more verbal aggression, and withdrawing. She struggled more in school and her manipulation and lying increased.[3] The behavioral therapist

---

[3]Soon after the potential third placement fell through, visits with Mother began. The clinical therapist recognized that that change also could have impacted Amy's behavior.

testified that Amy felt slighted and unwanted and thought the move to Foster Mother was her fault; these feelings were too much for a five-year-old to deal with on an emotional level. After Amy's setback, the behavioral therapist had to reteach her the concepts of keeping her hands to herself, following directions, and being respectful.

Amy was generally healthy but needed to begin occupational therapy for sensory issues. She had been diagnosed with an adjustment disorder and also had anxiety, as manifested by her hyperactivity and stomachaches. It was difficult to keep her focused.

Amy was to begin kindergarten in the fall semester after the trial ended. The caseworker testified that Amy was very bright and liked school. She had previously experienced trouble in the school cafeteria, but the caseworker speculated that Amy's sensory issues could have been the root cause. Amy was girly, creative, bossy, and lovable.

The behavioral therapist testified that at first, Brad was very active, talkative, and social, but he too had impulse-control issues and problems with aggression and lying. In addition, he had problems with listening. The behavioral therapist had seen Brad hit others at school and at home out of anger, if he did not get his way, or if they had one of his possessions. She worked with him on reducing his aggression, using his words, and improving his listening skills and ability to follow directions.

Brad became more aggressive over time, showing both anger and rage. The clinical therapist had observed two separate incidents in which he dissociated from reality:

> He . . . would get the puppets. He would throw them. He would lower his voice. There was a change of look in his eye. He would become very stiff and rigid and would yell at them. He would say they were bad boys. He would say: You're in trouble; and, then, he would stop . . . and the—the gentleness would return to his eyes; and his body would become more . . . relaxed.

The first incident lasted about five minutes; the second only about fifteen seconds. In the month before trial, the behavioral therapist also observed two different incidents of dissociative behavior when she was alone with Brad.

The CPS caseworker testified that Brad would begin pre-K in the fall after the trial. He was physically healthy overall, but he had begun stuttering, so he could need speech therapy again. He was receiving clinical therapy and behavioral therapy and could also need occupational therapy again for sensory issues.

By the time of trial, both children would punch, hit, kick, and spit on each other and the behavioral therapist. Brad would also physically lash out at Foster Mother, but the evidence conflicted on whether Amy did so. The behavioral therapist taught both children coping skills to help them deal with their own aggression. Neither child was taking any mental-health medication.

The clinical therapist stated that the multiple foster placements negatively affected therapy. She was concerned about any placement change that could occur as

22

a result of trial. She testified that both children needed stability, safety, and security, and it would be better for them to stay with Foster Mother than to move to Grandparents' house just for stability's sake. The clinical therapist further testified that while the children needed love, support, consistency, firm boundaries, and understanding that their extreme behaviors resulted from trauma, their need for security was key, as shown by their wanting to have therapy sessions under the bed. She also opined that Foster Mother, who was eager and amenable, needed more resources, help, and trauma-based training and that the children's visits with Grandparents should continue. The behavioral therapist testified that Foster Mother was a little naïve, had a lot to learn about parenting, and needed more trauma-based training but was eager and had shown improvement in managing the children's behavior over the last sixty days. Foster Mother was not a confident parent yet, but she could become one over time with practice. The behavioral therapist agreed with the clinical therapist that no placement change should occur at the time of trial and also agreed that the children's connection with Grandparents needed to remain.

Grandmother testified that it would hurt the children if they could not have Mother in their lives and supervised visits with her. Grandfather testified that he believed some relationship with her going forward was in their best interests. The GAL testified that the children were still connected to Mother, that they loved and asked for her, and that it would be detrimental to their physical, mental, and emotional well-being if they could no longer have a connection to her. The children's

23

clinical therapist could not say whether a continued relationship with Mother would aid the children's recovery.

At trial, Mother was still facing felony charges for injury to a child. She did not have stable housing but was staying with an aunt and uncle in an RV while she repaired a trailer home to make it suitable for habitation. She had reportedly begun taking her mental-health medications again. However, she had a history of not taking her medicine consistently. Further, she did not complete anger-management classes or individual counseling before the trial despite the incidents giving rise to the children's removal.

### 3. Mother's Parental Abilities

The evidence showed that Mother had relied on Grandparents to shoulder many of the parenting responsibilities for her children before the removal. Grandmother had testified that Mother sometimes had not been a good parent; had not given the children a stable home; did not know how to parent independently; could not complete a task; could not remember important things like taking the children to the doctor; often became emotional; and did not give the children enough attention.

After the removal, Mother did not see the children for about eleven months because she was in jail. However, she missed only one visit after she was released from jail, and she called CPS before that missed visit to report that she was sick. On the visits, she would engage with the children and play with them.

Mother completed the court-ordered parenting classes, but the GAL testified that Mother was unable to effectively discipline the children in visits. The CPS caseworker testified that

- Brad ran out of a visit with her and asked for his "mommy" while in the visit with her.

- Mother seemed frustrated in visits.

- Mother did not always hug the children back in the visits.

- Mother often ignored the children in visits.

- The children's needs were more than Mother could handle.

- She had not taken care of their needs in the past.

- Mother's continuing to be a parent was not in the children's best interests.

### 4. Plans for the Children

The Department's plan for the children was termination and adoption. Foster Mother was attached to the children and wanted to adopt them if they became available for adoption. If she were to adopt the children, she would be open to maintaining the children's relationship with Grandparents but would want to be in control and discuss the matter with Grandmother.

At trial, Mother was not seeking to have the children placed with her. Mother wanted the children placed with Grandparents and to have supervised visits with them. Mother also told the GAL that she would agree to no contact between Grandmother and herself if Grandmother were awarded custody.

### 5. Mother's Excuses for Her Acts or Omissions Showing the Parent-Child Relationships Were Improper

Mother points to her incarceration and mental illness and to evidence that she had been physically abused in her past as excuses for her mistakes as a parent and her failure to complete the court-ordered services. However, as the Department points out, Mother had months to complete her services after she was released from jail. Further, given the incidents that led to the removal, her mental illness, and her experience as a victim of domestic abuse, it is telling that she did not complete her anger-management classes and individual counseling.

### C. Analysis

Grandmother did not appeal the trial court's denial of her petition in intervention. Although Mother did not seek to have the children placed with her at trial, that appears to be her stance on appeal. However, nothing in the record supported awarding Mother the children. Her felony charges, her behavior at the root of those charges, her history of failing to protect her children and put them first, her history of not taking her mental-health prescriptions consistently, her lack of a suitable, stable home, and the children's desperate need for security and stability all support the trial court's findings that termination of the parent–child relationships is in the children's best interests. *See, e.g.*, *In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *12–15 (Tex. App.—Fort Worth Mar. 28, 2019, pet. denied) (mem. op.) (upholding best-interest finding against mother who had endangered her

children because of her endangering conduct, her coping issues, her dependence on others, her showing of no improvement as a parent despite CPS services, and the children's need for safety and stability, among other factors). We overrule Mother's fourth issue.

## CONCLUSION

Having overruled Mother's first, second, and fourth issues, which are dispositive, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: March 5, 2020